Fred RUSSELL, Petitioner,

v.

Jim JONES, Respondent.

No. 87–0162–CV–W–JWO.

United States District Court, W.D. Missouri, W.D.

Feb. 16, 1988.

Bruce C. Houdek, Kansas City, Mo., Court-appointed, for petitioner.

Patrick L. King, Stephen D. Hawke, Asst. Attys. Gen., Office of the Atty. Gen., Jefferson City, Mo., for respondent.

---

MEMORANDUM OPINION AND ORDER DENYING PETITION FOR HABEAS CORPUS

JOHN W. OLIVER, Senior District Judge.

I

On June 17, 1987, we filed a memorandum opinion in this State prisoner habeas corpus case and entered an order pursuant to 18 U.S.C. § 3006A(g) appointing Bruce C. Houdek, Esquire, to represent the petitioner. That memorandum opinion noted that four grounds for federal habeas corpus relief were alleged in petitioner's petition: (1) ineffective assistance of trial counsel based on an alleged failure to call petitioner's two brothers as alibi witnesses; (2) unlawful use of a coerced and involuntary confession; (3) insufficiency of the evidence; and (4) ineffective assistance of trial counsel based on failure to object to alleged use of an unrelated crime.

Our June 17, 1987 memorandum opinion determined that petitioner had exhausted all four claims and that the State trial court failed to conduct a Rule 27.26 evidentiary hearing. Mr. Houdek was accordingly directed to make an appropriate factual investigation and to file a report of his investigation.

Mr. Houdek's report was filed on October 13, 1987. That report established the necessity for an evidentiary hearing. Accordingly, on October 19, 1987, an order was entered setting the case for evidentiary hearing on petitioner's ineffective assistance of counsel claim.

The hearing was conducted on November 16, 1987 and the parties have filed proposed findings of fact and conclusions of law in regard to that claim. The other issues have been fully briefed and the case is at long last ready for decision.

We consider petitioner's claims in the order alleged in his petition and state the reasons why the petition for habeas corpus must be denied.[1]

---

1. In part VI we will consider respondent's pending motion for payment of transcript fees and state the reasons why that motion will be denied.

## II

### A.

Petitioner alleged as the first ground for habeas corpus relief that he was denied the effective assistance of counsel for the reason defense counsel "failed to have petitioner's brothers (Ira and Marvin) testify in trial that he was home on the date and time the alleged crime occurred...." Petition at 7A.[2]

Both parties agree that the standard to be applied in determining an ineffective assistance claim is the standard of reasonableness stated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984). That case makes clear that the burden rests on a convicted defendant to show both that (1) his counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense.

Although *Strickland* expressly refused to articulate "specific guidelines" or to set forth a "particular set of detailed rules for counsel's conduct," *id* at 688, 104 S.Ct. at 2065, it discussed defense counsel's duty to investigate in some detail. The Court made clear that all choices made by counsel in regard to investigation cannot be justified on the theory that all such choices are simply matters of trial strategy.

For the Court expressly stated its agreement with the Eleventh Circuit Court of Appeals' view that "strategic choices made after thorough investigation of law and facts relevant to plausible options" present a factual situation that is substantially different from "strategic choices made after less than complete investigation." *Id.* at 690–91, 104 S.Ct. at 2066. A strategic choice made after a "less than complete investigation" can be considered to be a reasonable choice "precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 691, 104 S.Ct. at 2066. *Strickland* also noted that the "reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions" and that "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." *Id.* at 691, 104 S.Ct. at 2066.

Inquiry must therefore be made in regard to what the defendant told defense counsel about whether his brothers' testimony could establish an alibi defense, what investigation defense counsel made in that regard, and what defense counsel learned as a result of her investigation. For the burden rests on the petitioner to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment" and this Court thereafter "must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066. We turn now to the factual circumstances established by the record and by the evidentiary hearing conducted by this Court.

### B.

A three-count indictment was filed November 9, 1979 charging the petitioner in Count I with first degree burglary, in Count II with rape, and in Count III with armed criminal action. Exhibit E at 1. The Public Defender was appointed to represent petitioner on November 11, 1979 at the time of his arraignment. *Id.* at 3. The

---

2. Mr. Houdek's report reflects that petitioner told Mr. Houdek that he had informed his defense counsel that he, at the time of the offense, was "either at band practice, on his way home from band practice with Leon Williams, a/k/a Barry, Richard Phillips, a/k/a Bud, Byron Gun, Calvin Styles, Vincent and Laverne Gray or at home with his brothers Ira and Marvin Russell." Document 22 at 1–2. Mr. Houdek, however, reported that the only member of the band that he was able to locate was Calvin Styles who indicated to Mr. Houdek that "he is acquainted with the other persons petitioner has named as members of the band but when interviewed he could not specifically recall a band member of the name of Fred Russell." *Id.* at 8. While the petitioner testified about the members of the band at trial and at the hearing before this Court, petitioner's federal habeas corpus claim is grounded solely on defense counsel's alleged failure to call his two brothers as alibi witnesses at trial.

Public Defender assigned the defense of the case to Assistant Public Defender Susan Chapman.[3]

Ms. Chapman received the file on November 19, 1979 and, after reading the file and picking up the police reports, visited petitioner in jail on November 21, 1979. Doc. 31 at 33.[4] Ms. Chapman testified that petitioner told her at that first interview "that he was not guilty, that the written and signed confession that was received from him was involuntary, it was coerced from him after he was told that he had been identified in a lineup, and was told that police beat confessions out of people." *Id.* at 34. She also testified that "he told me at that time that the police did not have permission to enter his house when he was arrested, and I was questioning him on that because of *Payton v. New York*, which was a newly decided case at that time"[5] and that "my notes do not reflect that he mentioned any alibis." *Id.* at 34. When Ms. Chapman was asked "[d]id he mention to you that his brothers could testify that he was home the night of the offense," she answered "[n]o, he did not mention that at all." *Id.* at 34.

Petitioner's testimony before this Court was not entirely inconsistent with Ms. Chapman's recollection of what was said at the November 21, 1979 interview. Petitioner testified generally on direct examination as follows:

Q During the time Susan Chapman represented you, did you discuss with her the presentation of an alibi defense?

A Yes, I told her I was at band practice and the guys had dropped me off to my house. My brothers were there.

Q And did you tell her whether or not you went out after you got home?

A I don't know if she asked me that question or not.

Q Did you tell her that your brothers could testify concerning this?

A No, I just told her I was either at band practice or at home with my brothers.

*Id.* at 24–25.

When specifically asked on cross-examination about what was said at the November 21, 1979 meeting, the petitioner testified as follows:

Q Do you remember what she discussed at that meeting?

A Whether I was at home, I think.

Q That is what she discussed at the meeting on November 21, 1979, she discussed whether or not you were at home the night of the offense?

A I think so, yes.

Q Did you tell her that your brothers could swear that you were at home that night?

A I told her my brothers—I told her I was at band practice, so my brothers would know where I was at. That is what I told her.

*Id.* at 29–30.

Ms. Chapman's notes reflected that she talked with the petitioner's mother, Ms. Elizabeth Porter, on November 27, 1979 and thereafter visited petitioner in jail a second time on December 6, 1979. *Id.* at

**3.** Ms. Chapman joined the Public Defender's Office in 1978 and had tried approximately 25 jury cases by the time she was appointed to represent the petitioner. Document 31 at 31–32.

**4.** Ms. Chapman maintained a file during the time she represented petitioner. Much but not all of her testimony was based on her memory as refreshed by her review of various notes that she had contemporaneously placed in that file. *Id.* at 33.

**5.** It is obvious that Ms. Chapman was not afforded the opportunity to refresh her recollection by reading either the transcript of the motion to suppress hearing or the transcript of the

second trial. For it was her unrefreshed recollection that *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), had been decided a few days before she first interviewed the petitioner on November 21, 1979. Doc. 31 at 34. *Payton*, however, was not decided until April 15, 1980, two days before the motion to suppress hearing was conducted on April 17, 1980, a fact to which Ms. Chapman made appropriate reference in her argument in support of the motion to suppress. *See* Exh. J at 77.

The inaccurate reference to the date *Payton v. New York* was decided is of no moment. For petitioner's claim for federal habeas corpus relief is not grounded on any alleged violation of the principles articulated in that case.

35. Ms. Chapman testified that on December 6, 1979, petitioner told her substantially the same thing he had told her during her November 21, 1979 visit.[6] She testified as follows in regard to the December 6, 1979 visit:

Q Once again did he mention any witnesses that could place him at home at the time of the occurrence?

A He didn't mention an alibi.

*Id.* at 36.

Ms. Chapman's notes reflect that she talked with petitioner's mother "approximately ten times" before the case was tried for the first time in May of 1980. *Id.* at 36. She testified that Mrs. Porter never mentioned to her that her other two sons would "testify that Fred was home at the time of the occurrence." *Id.* at 36. In regard to whether she had talked with petitioner's brother Ira before the first trial, she testified that "I talked to him several times. He would call—he and his brother, Marvin, would call regularly" and that during those conversations "Ira [did not] mention that he could place his brother at home, [or that] he could swear that his brother was home at the time of the occurrence." *Id.* at 37. Ms. Chapman explained that "[w]e talked more specifically about whether he gave the police permission to enter the house on the day of the arrest. With regard to giving any alibi, he never mentioned anything about what happened two days before." *Id.*

### C.

■ We find under all of the circumstances that occurred before petitioner's first trial in May of 1980, as those circumstances are established by the credible evidence, that the information given Ms. Chapman before the first trial by the petitioner, by petitioner's mother and by his two brothers did not impose any duty on defense counsel to make any additional investigation into whether a possible alibi defense could be established by the testimony of petitioner's two brothers. That finding, of course, is based on our determination that Ms. Chapman was the most credible witness in regard to those circumstances and our rejection of the credibility of any testimony that could be said to be inconsistent with that of Ms. Chapman.

We further find Ms. Chapman's testimony credible that the "first time I heard anything about an alibi was when Fred testified to it on cross-examination at the first trial." *Id.* at 37. The first trial, which commenced May 15, 1980, resulted in a hung jury. *Id.* at 38. Inquiry must therefore be made in regard to defense counsel's preparation for petitioner's second trial.

### D.

■ Ms. Chapman visited petitioner on July 1, 1980 to obtain further information in regard to the alibi testimony he gave on cross-examination at the first trial. The information given defense counsel, however, related to petitioner's band practice claim rather than to what testimony his brothers might give.[7] In specific regard to

---

6. Ms. Chapman testified that: "He again told me that his statement was coerced. He said the police told him, 'You better sign this paper,' that he again told me that the police implied that the victim had picked him out on the lineup on the rape case, that hair samples had been taken, that the police were threatening him, they were feeding him with words about what happened on the incident and that he went ahead and said that he had committed the crime even though he didn't do it because he knew police beat people up and he was afraid the police would beat him. He said that the police, quote, said they would kick his ass if he didn't make a statement, and they said that they would get the police officer who arrested him on the prowler call to come in and identify him." *Id.* at 35–36.

7. Ms. Chapman testified in regard to the July 1, 1980 interview that: "I asked Fred to give me more specific information concerning this alibi. He testified at trial, the first trial, that he left band practice around nine or ten that night and that he had been with a guy named Barry, who lived at 43rd and Bellefontaine, a guy named Gun, ... [who] lived in the project, a guy named Bud who lived at 41st and Flora, a guy named Phil who lived in the project, a guy named Vincent who lived at 56th and Paseo, and that he left 56th and Paseo at nine or ten at night. I told him that we needed more specific information in order to investigate, No. 1, who these people were and their exact location." Doc. 31 at 39. There is no necessity to state the evidence concerning the petitioner's failure to fur-

petitioner's brothers, Ms. Chapman testified as follows:

Q Did he talk about the fact that his brothers could place him at home at the time of the occurrence? Did he mention that on the July 1 visit?

A No, he didn't.

*Id.* at 40. Ms. Chapman visited petitioner again on August 5, 1980. *Id.* at 41. She testified that she did not "specifically ask him [about whether his brothers could testify] because he didn't say that his brothers could give him an alibi." *Id.*

Petitioner did not testify about what he may have said to his counsel at either the July 1, 1980 or the August 5, 1980 interviews. We find Ms. Chapman's testimony is credible in regard to those interviews. We also accept her testimony that in addition to attempting to procure an accurate list of the members of the band, she "proceeded to get additional information concerning Fred's intelligence, Fred's ability to read, things like that, aimed at showing the jury at the next trial that Fred really could not give informed consent, was not able to read the statement that he signed, in support of the theory of defense that I thought was most productive which was that this woman could not identify the suspect, that the police needed to find the suspect, that they basically coerced a statement out of him." *Id.* at 40.

We further find that Ms. Chapman talked with petitioner's brother Ira approximately once a week between the first and second trials; she noted that they "were a pretty close family and very supportive." *Id.* at 42. In regard to whether either of the brothers told her that they would be able to give alibi testimony, Ms. Chapman testified that "I specifically remember talking to them at the time of the second trial

about whether they could provide any additional help" and that "[a]ll they could tell me at the time of the second trial, which is the only time I specifically remember discussing whether they could alibi Fred, was that Fred usually came straight home after band practice, and although they didn't specifically remember this day, that he was probably at home, and it was very vague." *Id.* at 42–43.[8]

Ms. Chapman further testified as follows:

Q Prior to the trial, you had occasion to talk to the brothers again?

A Yes.

Q What did they say on the day of or just prior to the trial?

A They said that they knew that Fred usually came right home after band practice. They didn't specifically remember that particular band practice or that particular night, but that when he got home he usually didn't leave after he got home.

*Id.* at 44. Ms. Chapman explained that she did not call either Ira or Marvin Russell to the stand at the second trial "because I thought that their testimony was too vague." *Id.* at 44.

Although some of the testimony given at the evidentiary hearing by the petitioner and by his two brothers may be said to be inconsistent with Ms. Chapman's testimony as to what she learned in regard to what testimony the brothers could give if called to the stand at the second trial, we are satisfied that Ms. Chapman was the more credible witness and that her testimony rather than that of the petitioner and his brothers must be accepted.

### E.

We find and conclude that petitioner failed to establish that Ms. Chapman did

---

nish defense counsel with an accurate list of the members of the band for the reason petitioner's claim for habeas corpus relief is confined to defense counsel's alleged failure to call petitioner's brothers as alibi witnesses.

8. Ms. Chapman added: "I don't remember telling them, but I do remember telling Fred that that was not a very good alibi and that my view of that was that juries are very dubious about this vague kind of alibis by family members

because at least my experience was that when you start to put on an alibi defense, the prosecutor gets up and argues who do you believe, do you believe the victim or do you believe the family members, and of course they don't want their family member to go to jail and they can't really tell you, so juries sometimes get confused about who has the burden of proof, and I explained that to Fred at the time." *Id.* at 43.

not make a reasonable investigation of the testimony that petitioner's two brothers might have given had they been called as alibi witnesses at petitioner's second trial. We also find and conclude petitioner has failed to establish that Ms. Chapman's decision not to call either Ira or Marvin Russell as alibi witnesses was not a reasonable decision under the circumstances of this case. Indeed, we find that the credible evidence established that Ms. Chapman's decision was, in fact, a reasonable one when considered in light of what she was told by the petitioner and by his two brothers.

The vagueness of what Ira Russell's testimony would have been at trial is illustrated by the fact that his testimony at the evidentiary hearing established that he could testify only in regard to petitioner's "normal evening activity" and when petitioner would "normally get home from band practice." Doc. 31 at 8. Marvin Russell testified at the evidentiary hearing that while he knew his brother "had a regular time that he got home from band practice," he did not "know if he went out after he got home that evening." *Id.* at 17–18.

Marvin Russell testified as follows at the evidentiary hearing:

Q  Now, did you feel that you had any information that you needed to give to this attorney?

A  No.

Q  If you felt that you had some information that would have been helpful to your brother, would you have provided it to his attorney?

A  Yes.

*Id.* at 21.

Both of petitioner's brothers demonstrated their willingness to be helpful to their brother by testifying at the evidentiary hearing conducted by this Court. We find

and conclude, however, that their testimony and that of the petitioner failed to establish that Ms. Chapman's failure to call either Ira or Marvin Russell as alibi witnesses constituted deficient performance under the first component of the *Strickland* standard. *See* 466 U.S. at 687, 104 S.Ct. at 2064. We further find and conclude that Ms. Chapman's decision not to call either of his brothers to the witness stand at the second trial was a reasonable decision in that it was based on her considered professional judgment that she "thought that their testimony was too vague." *Id.* at 44. That decision was consistent with her equally reasonable decision not to offer an alibi instruction at the second trial "because that was not my theory of defense." *Id.*

We turn now to the second ground alleged in the petitioner's petition for habeas corpus relief.

## III

### A.

■ Petitioner alleged in his second ground for habeas corpus relief that his "[c]onviction was obtained by the use of a coerced and involuntary confession because petitioner's will was overborne by threats and promises of leniency by detective Clarence Gibson...."[9] Petition at 7A.

On November 30, 1979, shortly after her first interview with the petitioner in jail, Ms. Chapman filed a motion to suppress statements which prayed that "the Court grant an evidentiary hearing concerning the voluntariness and admissibility of statements made by defendant pursuant to the Due Process Clause of the Fourteenth Amendment and *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)."[10] Exh. E at 4. An evidentiary

---

9. Petitioner further alleged that he denied all involvement when he was arrested and that it "was not until detective Clarence Gibson promised him if he signs some papers he had prepared for petitioner that he would be allowed to go home. Petitioner has a reading disability, and detective Gibson told petitioner what he wanted him to say." Petition at 7B.

10. That motion alleged that all of petitioner's statements, whether written or oral, were made "before the defendant was offered an opportunity to consult with counsel, without counsel present, and without warning to the defendant of his constitutional rights"; were made "when defendant was intoxicated, under the influence of narcotics, undergoing great mental strain, and in physical pain"; that the "defendant was

hearing on the motion to suppress was conducted before Judge Hanna on April 17, 1980, shortly before the first trial commenced on May 15, 1980. *See* Exh. J. Detective Harlow, Detective Gibson, and the petitioner testified at length at that hearing. After hearing the arguments of counsel, Judge Hanna took the case under advisement. *Id.* at 75–79.

On May 9, 1980, Judge Hanna entered an order overruling petitioner's motion to suppress. *See* Exh. B attached to Doc. 8. Judge Hanna found that petitioner's "statements were not induced or coerced by any threats, promises or actions of the investigating officers" and that the "statements were made freely and voluntairly [sic]."[11] Exh. B. After petitioner's first trial resulted in a hung jury, the case was transferred to Judge Sprinkle for a second trial.

On July 23, 1980, after that transfer was made, petitioner filed a motion for rehearing of motion to suppress statements. *See* Exh. C attached to Doc. 8. That motion recited the procedural history of the case and then alleged that since "the hearing on the Motion to Suppress Statements and since the first trial of this case, counsel for Fred Russell has discovered additional evidence bearing upon the issues of whether said statements, if any, were made with Fred Russell's understanding of his constitutional rights to remain silent and whether any waiver of Fred Russell's constitutional rights to remain silent was knowing and voluntary." *Id.* at 2.

Petitioner's motion alleged that petitioner's educational records from Van Horn High School indicated that "Fred Russell is a person of extremely low verbal aptitude and achievement and that the reading skills of Fred Russell have deteriorated in recent

years from a second grade reading level to a first grade reading level." *Id.* That motion also alleged that Lucy Goodman, Fred Russell's reading teacher would testify that "Fred Russell was singled out as a student with especially severe problems in learning to read and with low verbal skills" and that he "does not have the verbal and reading ability to understand oral *Miranda* warnings or to read written *Miranda* warnings." *Id.*

Judge Sprinkle granted the prayer of the motion and on August 18, 1980, conducted a further evidentiary hearing at which the custodian of records at Van Horn High School and Ms. Lucy Goodman testified in support of the motion and Detective Gibson gave further testimony in opposition. *See* Exh. A at 2–37.

After hearing those witnesses, Judge Sprinkle denied petitioner's motion and stated the following:

> With regard to the Motion to Suppress, once again, I think this is a matter that should be submitted to the jury, and have them resolve the question as to whether or not Mr. Russell could or did read the form. I would deny the Motion in its present form.

*Id.* at 37.

*Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), requires that this Court give plenary federal review to the issue of the voluntariness of petitioner's confession. That case reversed the Third Circuit's conclusion that "the voluntariness of a confession is an issue of fact entitled to the § 2254(d) presumption," *id.* at 105–06, 106 S.Ct. at 447, and held that "it would be inappropriate to abandon the Court's longstanding position that the ultimate question of the admissibility of a con-

---

induced and coerced to make such statements by threats, promises, and actions of investigative officers"; that the statements were made "prior to presentment before a committing judge and after the lapse of an unreasonable amount of time from the time of arrest"; and that all of the statements were "products of an illegal arrest." Exh. E at 4–5.

11. Judge Hanna further found that at the time petitioner "made the statements to the police he was not intoxicated, under the influence of nar-

cotics or under any mental stress or in any physical pain which would make the statement involuntairy [sic]." Exh. B. Judge Hanna's order also found and concluded that petitioner's "arrest was legal" in that "the defendant's brother gave the police officers permission to enter the house" and that "the police had probable cause to make the arrest." *Id.* The validity of the findings and conclusions stated in this footnote are not in issue under the allegations of petitioner's federal petition for habeas corpus.

fession merits treatment as a legal inquiry requiring plenary federal review." *Id.* at 115, 106 S.Ct. at 452. That case also requires that "the federal habeas court, should, of course, give great weight to the considered conclusions of a coequal state judiciary." *Id.* at 112, 106 S.Ct. at 451.

Judge Hanna, after conducting an appropriate evidentiary hearing, concluded that petitioner's statements were made freely and voluntarily. Exh. B attached to Doc. 8. Judge Sprinkle, after conducting a second evidentiary hearing, again denied petitioner's motion to suppress. Exh. A at 37. The voluntariness of petitioner's confession was properly submitted to the jury pursuant to Instruction No. 8. Exh. E at 15. That instruction was in accord with applicable federal standards.

This Court's independent plenary review of the record requires that we find and conclude that, under the totality of the circumstances, the facts found by the state trial judges were reliably found and that those judges properly applied applicable federal standards in their determination that petitioner's motion to suppress should be overruled. Accordingly, we find and conclude that the petitioner has failed to carry the burden of showing that his conviction was obtained by the use of an involuntary confession as alleged in the second ground of his habeas corpus petition.

### IV

Petitioner alleged as the third ground for habeas corpus relief that his "[c]onviction cannot constitutionally stand because the evidence presented at trial is insufficient to permit a rational trier of fact to find all essential elements of guilt beyound [sic] a reasonable doubt due to the circumstantial evidence had petitioner's inadmissible police statement been excluded from evi-

dence." [12] Petition at 7B. It is obvious that petitioner's claim is based on the untenable premise that his confession should not have been admitted in evidence.

Application of the standard articulated in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that appropriate consideration be given petitioner's confession in our determination of the sufficiency of the evidence to support the jury's verdict. For we have determined that the confession was properly admitted in evidence. Consideration of petitioner's confession eliminates any reasonable doubt that the evidence was sufficient to sustain the verdict.

We accordingly find and conclude that petitioner's third ground is untenable.

### V

Petitioner alleged as his fourth ground for habeas corpus relief that his "counsel failed to object to ... identification testimony at trial." Petition at 7C. The testimony to which petitioner made reference was described in his claim as evidence of "an unrelated crime" and detailed in the "supporting facts" portion of his petition in which petitioner alleged that "[o]n October 14, 1979, victim made a prowler call to the police ... When the police arrived they searched the area for the peeping tom. A man was stopped who gave petitioner's name and other correct information about him ... The police told victim this was the man and his name is Fred Russell. Victim thought prowler and burglar were same person because of height and size." [13]

It is appropriate to note at the outset that "questions concerning the admissibility of evidence are matters of state law, and are reviewable in federal habeas corpus proceedings only when the alleged error

---

**12.** Petitioner alleged in the "supporting facts" portion of his petition that "[h]ad petitioner's involuntary statement been excluded, the state's case would have rested on mere circumstantial evidence and created an insufficiency of evidence to sustain a verdict of conviction." *Id.*

**13.** The identification testimony admitted at trial was first adduced at the suppression hearing conducted before Judge Hanna. Judge Hanna

reliably found that the police had knowledge before petitioner was arrested that the petitioner had been "at the victim's house approximately 15 days earlier and had attempted to enter the home through the same kitchen window and that the defendant in this case was the same height, weight, age and physical size as the individual identified by the victim some 15 days before the rape at her home." Exh. B.

infringes upon a specific constitutional protection or is so prejudicial that it amounts to a denial of due process." *Manning–El v. Wyrick,* 738 F.2d 321, 322 (8th Cir.), *cert. denied,* 469 U.S. 919, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984). That case further noted that under Missouri law proof of the commission of an unrelated crime is admissible if that evidence "has a legitimate tendency to establish the defendant's guilt of the charge for which he is on trial" and if such evidence "reasonably tends to prove a material fact in issue, it should not be rejected because it incidentally proves the defendant guilt[y] of another crime." *Id.*

*Manning–El* also held that in order to establish a denial of due process a state prisoner "must prove that the asserted error was so conspicuously prejudicial or of such magnitude that it fatally infected the trial and deprived him of fundamental fairness" and that in making that determination a federal habeas court "must review the totality of the facts in the case and analyze the fairness of the particular trial under consideration." *Id.* at 323.

*United States v. Lee,* 782 F.2d 133 (8th Cir.1986), considered a defendant's ineffective assistance claim based on "counsel's failure to object to evidence of other crimes [which] prejudiced his right to a fair trial." *Id.* at 135. *Lee* rejected that claim for two reasons. First, the *Lee* court concluded that the evidence of an unrelated crime was admissible under the circumstances of that case and thus defense counsel "cannot be rendered ineffective for failing to object to evidence that would have otherwise been admissible." *Id.* at 136. *Lee* rejected the defendant's claim for the second reason that the defendant had failed to establish the prejudice component of *Strickland*'s two-part standard. *Lee* accordingly held that "[e]ven if counsel's failure to object constituted error, Lee has failed to show that but for this error, the result of the trial would have been different." *Id.*

■ It is thus clear that even if it is assumed that defense counsel's perform-

ance was deficient in failing to object to the testimony of the unrelated crime, the petitioner has the burden of showing that the admission of that evidence deprived him of a fair trial and that he suffered prejudice in that if the evidence had been excluded, the result of the trial would have been different.

■ We are satisfied from our review of the evidence adduced at trial that we must find and conclude that the petitioner failed to carry the burden of showing prejudice, the second component of the *Strickland* standard. *Strickland* establishes that "there is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S.Ct. at 2069. Indeed, *Strickland* recommended that if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

This is an appropriate case for this Court to follow that recommendation. For the fact the petitioner's confession was properly admitted in evidence for the jury's consideration makes it highly unlikely that the evidence about which petitioner complains had any substantial impact on the result of the trial. We so find and conclude.

We further find and conclude that the result of the trial would not have been different had the evidence been excluded. For the reasons stated, we find and conclude that petitioner's fourth claim for habeas corpus relief is untenable.

We turn now to respondent's pending motion.

## VI

### A.

■ On August 7, 1987, the respondent filed a motion for payment of transcript fees based on the fifth sentence in 28 U.S. C. § 753(f), the federal court reporter statute.[14] Because that motion presents a

---

14. The fifth sentence of Section 753(f), upon which the respondent relies, provides that:

"Fees for transcripts furnished in other proceedings to persons permitted to appeal in forma

question of first impression and is based on a ground never presented in any case known to this Court, we state the reasons why it will be denied in some detail.

Respondent's motion accurately alleged that this Court entered an order on June 17, 1987 which "directed respondent's counsel furnish this Court with the transcript of petitioner's hearing on his motion to suppress evidence at criminal trial, of April 17, 1980" and that the respondent "has produced and attached the transcript as Respondent's Exhibit J." Respondent's motion, however, inaccurately alleged that "this Court by its Order has certified the above-styled case ... presents a substantial question, pursuant to 28 U.S.C. § 753(f), fifth sentence."

Based on that inaccurate statement of the record, the motion further alleged that "respondent is entitled to require the United States pay the Jackson County, Missouri circuit court reporter's fees for the preparation of said transcript, ... under 28 U.S. C. § 753(f), fifth sentence; *Thompson v. Housewright*, 741 F.2d 213, 216 (8th Cir. 1984)." The files and records in this case simply do not in any way support or even suggest that this Court entered any order that purported to make a Section 753(f) certification.

The files and records in this case do establish that this Court experienced considerable difficulty in obtaining a copy of the transcript of the April 17, 1980 suppression hearing conducted by Judge Hanna. This Court's original order to show cause

was entered March 6, 1987. That order, consistent with the mandate of Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, specifically required that the "[r]espondent shall attach to his response to this order to show cause all documentary evidence supporting the arguments made in that response, including transcripts of proceedings connected to the conviction challenged in the pending petition." [15]

Although a substantial number of exhibits were attached to the respondent's initial response, a copy of the transcript of the April 17, 1980 suppression hearing was not attached. Accordingly, on April 10, 1987, this Court was required to enter a second order pursuant to Rule 5 which provided that "the respondent shall prepare, serve, and file a supplemental response to this Court's order to show cause to which shall be attached the documentary evidence reflecting the full procedural history conducted (a) in regard to petitioner's November 30, 1979 motion to suppress statements." Respondent's first supplemental response again failed to attach a copy of the April 17, 1980 transcript.[16]

Neither respondent's initial response nor the first supplemental response suggested that the April 17, 1980 suppression hearing had not been transcribed. Rule 5 imposed a mandatory duty on the respondent to make such a statement, if true, in the initial answer filed to an order to show cause entered in a state prisoner's habeas corpus case.[17] Accordingly, this Court was thus

---

pauperis shall also be paid by the United States if the trial judge or a circuit judge certifies that *the appeal* is not frivolous (but presents a substantial question)." (Emphasis added).

It is unnecessary that this Court discuss the Section 753(f) certification made by the Court of Appeals in *Thompson v. Housewright*, 741 F.2d 213, 216 (8th Cir.1984), cited by the respondent. For the procedural posture of that case, which involved an appeal, was completely different from the procedural posture of this case.

**15.** Because recent experience in a large number of other state prisoner habeas corpus cases established that the initial responses filed by the Attorney General raised untenable exhaustion questions, the March 6, 1987 show cause order explained that "[a]ny question of exhaustion of remedies or any question under *Rose v. Lundy,*

455 U.S. 509 [102 S.Ct. 1198, 71 L.Ed.2d 379] (1982), raised by the response will be determined after review of all pertinent documentary evidence and all transcripts involved."

**16.** Exhibit A attached to the first supplemental response did establish that a suppression hearing had in fact been conducted before Judge Hanna on April 17, 1980 and Exhibit B attached thereto established that Judge Hanna overruled petitioner's motion to suppress on May 9, 1980.

**17.** The Advisory Committee Note to Rule 5 explains that the "rule requires the answer to indicate what transcripts are available, when they can be furnished, and also what proceedings have been recorded and not transcribed. This will serve to inform the court and petition-

required to enter still another Rule 5 order on June 17, 1987. That order again directed the Attorney General to "prepare, serve, and file a second supplemental response to this Court's order to show cause to which he shall attach a copy of the transcript of the hearing conducted by Judge Hanna on April 17, 1980 on petitioner's November 30, 1979 motion to suppress." [18]

On August 3, 1987, the respondent filed a second supplemental response to which, at long last, a copy of the April 17, 1980 suppression hearing before Judge Hanna was attached. Thereafter, on August 7, 1987, respondent filed the pending motion for payment of transcript fees.

### B.

The notion expressly alleged in respondent's motion that "the respondent is entitled to require the United States" to pay the State court reporter's bill for the transcript of the April 17, 1980 suppression hearing "under 28 U.S.C. § 753(f), fifth sentence" is untenable. Section 753 of Title 28, United States Code, authorizes the district courts of the United States to appoint court reporters to serve those courts and defines the duties and responsibilities of a federal court reporter. [19] Paragraph (f) of Section 753 simply regulates the fees a duly appointed federal court reporter may charge and collect for transcripts prepared by such a court reporter.

It should be obvious that no notice of appeal has been filed in this case. Respondent's factual contention that this Court made some sort of certification "pursuant to 28 U.S.C. § 753(f), fifth sentence," is contrary to and unsupported by the record in this case. Nor can it be said that this Court has entered any order or in any way suggested that a federal court reporter prepare a transcript of the April 17, 1980 suppression hearing that would support the payment of a fee to such a reporter under Section 753(f).

The procedural history of this case establishes that this Court was required to exercise the power and jurisdiction conferred by 28 U.S.C. § 2254(e) and by Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts after the respondent failed to attach a copy of the April 17, 1980 suppression hearing to his initial response. [20] Neither 28 U.S.C. § 2254(e) nor Rule 5 authorizes a district court to enter an order directing the United

---

er as to what factual allegations can be checked against the actual transcripts."

**18.** Our June 17, 1987 memorandum opinion explained that the third Rule 5 order was entered for the reason that "petitioner's claim in regard to the suppression of his confession may not properly be considered without an examination of the transcript of that hearing." We also noted that the "transcript of the April 17, 1980 hearing had apparently been prepared and was available to Judge Sprinkle at the time he heard additional testimony and considered petitioner's motion for rehearing. For the transcript of trial shows that on August 18, 1980 petitioner's trial counsel apparently made specific reference to [that] transcript ... in her cross-examination of Officer Gibson. *See* pages 35–37 of the trial transcript."

**19.** Detailed provision is made in that section in regard to how the number of federal court reporters to be appointed is to be determined, how the standards for appointment are to be established, the oath to be taken by an appointed reporter, how the appointment of additional reporters may be authorized, the duties to be performed, and the records that must be maintained.

**20.** Section 2254(e) provides: "If the applicant, because of indigency or other reason is unable to produce such part of the record [pertinent to a determination of the sufficiency of the evidence], *then the State shall produce such part of the record and the Federal court shall direct the State to do so by order directed to an appropriate State official.*" (Emphasis added). Rule 5 establishes the procedure by which the mandate of Section 2254(e) is to be implemented.

Rule 5 provides that the "answer shall respond to the allegations of the petition" and authorizes an order requiring that relevant transcripts be attached to that answer. The Advisory Committee Note to Rule 5 explains that: "Rule 5 details the contents of the 'answer' ... The answer plays an obviously important role in a habeas corpus proceeding: 'The return serves several important functions: it permits the court and the parties to uncover quickly the disputed issues; it may reveal to the petitioner's attorney grounds for release that the petitioner did not know; and it may demonstrate that the petitioner's claim is wholly without merit.' Developments in the Law—Federal Habeas Corpus, 83 Harv.L.Rev. 1083, 1178 (1970)."

States to pay fees for transcripts which record proceedings in the state court. Section 753(f), fifth sentence, is obviously inapplicable under the procedural circumstances of this case.

The repeated failure of the respondent to comply with the Rule 5 orders entered in this case unduly delayed the consideration of the merits of petitioner's claim that his confession was involuntary. The filing of respondent's pending motion based on Section 753(f) has unnecessarily required the expenditure of the always limited judicial time of this Court. An order will be entered denying the respondent's pending motion.

## VII

For the reasons stated, it is

ORDERED (1) that the pending petition for habeas corpus should be and is hereby denied. The Clerk is directed to enter a judgment on a separate document as required by Rule 58 of the Federal Rules of Civil Procedure for the respondent and against the petitioner. It is further

ORDERED (2) that respondent's pending motion for payment of transcript fees should be and the same is hereby denied. The judgment to be entered by the Clerk shall include a recitation of this order so that any question about the respondent's right to appeal this order is avoided. It is further

ORDERED (3) that Mr. Houdek shall file an application for fees under 18 U.S.C. § 3006A(g) for the service he has rendered petitioner pursuant to his appointment by this Court. We are grateful for the commendable and conscientious manner in which Mr. Houdek represented the petitioner.